J-S11016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF N.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: Q.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1471 WDA 2021 |

Appeal from the Order Entered November 9**,** 2021
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):  32-21-0265

BEFORE:  PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY OLSON, J.:                **FILED: MAY 24, 2022**

Appellant, Q.M. ("Father") appeals from the November 9, 2021[1] order, which terminated involuntarily his parental rights to his daughter, N.M. ("Child," born January 2018), pursuant to section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[2]  Father's counsel filed a petition to withdraw and brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After review, we grant the petition to withdraw and affirm the termination order.

---

[1] Although Father references the date penned on the instant order, we note the correct date of entry is the date on which the docket reflects that copies were sent to the parties – November 9, 2021.  **See** Pa.R.A.P. 108(b).  We have amended the caption accordingly.

[2] On the same day, the orphans' court involuntarily terminated the parental rights of A.B. ("Mother").  Mother did not appeal this determination and did not participate in the instant appeal.

We begin with an overview of the relevant facts and procedural history. In early 2020, Father and Mother resided together in Indiana County along with Child, then age two, and Child's half-sibling, K.B. N.T., 8/31/21, at 55. On February 27, 2020, Indiana County Children & Youth Services (the "Agency") received a report that staff at K.B.'s preschool had observed "deep bruising" on K.B.'s body. *Id.* at 56. When the Agency went to the family's home to investigate, caseworkers observed bruises on both Child and K.B. *Id.* at 56. Father admitted that he "physically manhandle[d]" Child and K.B. and caused their bruising. *Id.* at 57. Mother also admitted she was aware Father hit Child and K.B. but did not intervene. *Id.* Based upon the "significant bruising" on Child and K.B., the Agency removed Child and K.B. from the care of Mother and Father. *Id.* at 56-57, 65. The Agency placed Child and K.B. in the same foster home. *Id.* at 76. The juvenile court adjudicated Child dependent pursuant to the Juvenile Act[3] in March 2020. *Id.* at 80.

Shortly after the adjudication, the Agency ceased offering in-person visits due to the onset of the worldwide COVID-19 pandemic. *Id.* at 80. Father began in-person visits with Child in June 2020. *Id.* at 68. ACES,[4] a service provider of the Agency, supervised the visits, and they went "okay." *Id.* at 69. The main concern of ACES was that Father displayed a belief of

---

[3] 42 Pa.C.S.A. §§ 6301-6375.

[4] The full name of the organization is not in the record.

"having a very strong structure for the children," and ACES advised that Father should address this strong belief in corporal punishment in parenting classes. *Id.*

In addition to supervising the visits, ACES conducted a needs assessment of Father on June 8, 2020. *Id.* at 65. Based on that assessment, the Agency instructed Father to participate in services for drug and alcohol, mental health, and parenting. *Id.* at 66. Father initially cooperated and enrolled in each. *Id.* at 88.

In October 2020, Father was hospitalized for a week due to a mental health episode. *See id.* at 66, 68, 132. Father later explained during the termination hearing, "I lost my mind kind of. Some things came up that I couldn't deal with." *Id.* at 132. In November 2020, he elected to move in with his mother in Philadelphia, Pennsylvania, so that he could benefit from family support. *Id.* at 66, 88-89, 132. Father's visits then switched to telephone contact. *Id.* at 68. His move across the state also caused his providers to discharge him due to the providers' inability to service him outside the geographic area, although he was able to continue for a month with his mental health service. *Id.* at 88, 132-33. Father did not enroll in any services in Philadelphia. *Id.* at 66, 89-90, 133. Father claims he wanted to do so, but he had difficulty. *Id.* at 133.

At some point that is not clear from the record, Father and Mother were charged criminally for injuring Child and K.B.[5] *Id.* at 67. In March 2021, the Agency learned that Father signed a bond agreement in December 2020 which included a condition prohibiting contact with Child. *Id.* The discovery occurred after Father was incarcerated in March 2021 for violating this term *vis a vis* his telephone contact with Child. *Id.* at 68. Consequently, Father's telephone contact with Child ceased in March or April 2021. *See id.* at 67, 136.

On May 6, 2021, the Agency filed a petition to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(8), and (b). In early August 2021, several months after the Agency filed the petition and mere weeks before the termination hearing, Father returned to Indiana County, Pennsylvania and reengaged in services. *Id.* at 67, 90, 128, 134.

The orphans' court held a termination hearing on August 31, 2021. Counsel was appointed for Father and Child.[6] At the time of the hearing, Child was just over three and one-half years old. The Agency presented the testimony of psychologist Dr. Carolyn Menta; Agency caseworker Vicki

---

[5] Father's charges were still pending at the time of the termination hearing.

[6] Erica D. Dussault, Esquire, represented father. Patrick Dougherty, Esquire represented Child's legal interests. Katrina Kayden, Esquire, represented Child as guardian *ad litem* ("GAL").

Weaver, Mother, Child's maternal aunt (Aunt),[7] and Father. On November 9, 2021, the orphans' court entered an opinion and order terminating Father's parental rights under section 2511(a)(8) and (b). *See* Orphans' Court Opinion, 11/9/21. This appeal followed.[8, 9]

We begin by addressing the petition to withdraw and *Anders* brief filed by Father's counsel. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (citation omitted); *see also In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992) (extending the *Anders* procedure to appeals from involuntary termination decrees).

---

[7] Aunt filed an emergency petition to intervene in Child's dependency matter, with a hearing on the request to intervene scheduled at the same time as the termination hearing. The court continued the hearing regarding the petition to intervene. N.T., 8/31/21, at 3. In the termination matter, Mother's counsel presented Aunt's testimony, and Aunt testified that she desired to be a permanent placement resource to Child if the court terminated the rights of Mother and Father. *See id.* at 115-127. The court did not assess any evidence presented regarding Aunt at this time, other than to observe that Child had another option for long-term placement. *See* Orphans' Court Opinion, 11/9/21, at 22-23.

[8] Both Father and the orphans' court complied with Pa.R.A.P. 1925. Specifically, Appellant's counsel timely filed a notice of appeal along with a statement of intent to file an *Anders* brief pursuant to Pa.R.A.P. 1925(c)(4).

[9] Father's counsel filed a petition to withdraw and *Anders* brief in this Court. Father did not file a response. The Agency's counsel filed a joint letter which indicated that the Agency, Child's counsel, and the GAL did not plan to file a brief and requested that this Court affirm the order.

To withdraw pursuant to ***Anders***, counsel must:

1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [***Anders***] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

***Commonwealth v. Cartrette***, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted).

With respect to the third requirement of ***Anders***, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, the Pennsylvania Supreme Court has directed that ***Anders*** briefs must:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361.

Here, Counsel avers in her petition to withdraw that she has determined Father's appeal is frivolous after conducting a thorough and conscientious examination of the record. Counsel avers she mailed Father a letter explaining

his rights and attached a copy of the letter to her petition to withdraw and *Anders* brief. Counsel's letter complies with our law, as it informs Father that he may retain new counsel or proceed *pro se* and raise any additional arguments he deems worthy of our attention. Counsel's *Anders* brief includes a summary of the facts, procedural history of this case, and two issues that could arguably support Father's appeal. While minimal, Counsel did include an assessment of why those issues are frivolous, with citations to the record and relevant legal authority. As Counsel has complied substantially with *Anders*, we review the issues presented in her brief. We also "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015); *see also Commonwealth v. Dempster*, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*) (describing this Court's duty as a "simple review of the record to ascertain if there appear on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated").

Counsel identifies two issues for our consideration:

1. Did the [t]rial [c]ourt commit abuse of discretion or error of law when it concluded that the Agency established grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

2. Did the [t]rial [c]ourt commit abuse of discretion or error of law when it concluded that the termination of parental rights was appropriate and in [Child's] best interest pursuant to 23 Pa.C.S.A. § 2511(b)?

*Anders* Brief at 10 (page numbering supplied).

- 7 -

We review these issues mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). "[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-1124.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs

for a parent's care, protection, and support." ***In re Adoption of C.M.***, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." ***In re Adoption of L.A.K.***, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re Adoption of C.M.***, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." ***In re Adoption of C.M.***, 255 A.3d at 359; ***see also*** 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." ***Interest of L.W.***, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

In the instant case, the orphans' court granted the Agency's petition under subsections 2511(a)(8) and (b), which provide as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy subsection 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least 12 months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018).

- 10 -

Unlike other subsections, subsection 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). In fact, the Adoption Act prohibits the court from considering, as part of a subsection 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). While "the application of [subsection 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of [his or] her children.," this Court has recognized that

> by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

In the instant case, the orphans' court determined more than a year had elapsed since the Agency removed Child from Father's care due to Father's physical abuse. Orphans' Court Opinion, 11/9/21, at 17. Specifically, it found that "greater than 14 months elapsed from the date of the removal of the

children until the date of the filing of the pending [p]etition, and more than 16 months elapsed from the date of removal until the date of the hearing."[10] *Id.*

Next, the court found Father's move to Philadelphia and his failure to engage in services there "resulted in the passage of ten months in which no progress was made." *Id.* at 18. The court acknowledged Father's mental health crisis and resulting need to take care of himself, but concluded the Agency proved the conditions that led to Child's removal continued to exist. *Id.* at 18-19.

Finally, the court concluded termination served Child's needs and welfare because it could not place Child's need for stability on hold any longer while Father attempted to obtain his own stability and made promises for the future. *See id.* at 19.

We discern no error of law or abuse of discretion in the orphans' court's conclusions. From June 2020 to November 2020, Father visited with Child and participated in mental health, substance abuse, and parenting services to

---

[10] The orphans' court gave the parties an opportunity to address whether and how it should consider the COVID-19 shutdown in its determination of the time that elapsed from the date of removal to date of filing. *See* Orphans' Court Order, 9/20/21, at 3. The certified record does not identify which of the parties submitted memoranda on this issue. Nevertheless, the orphans' court determined, "[t]here was no testimony submitted by [] Father indicating that COVID-19, or any shutdown resulting therefrom, delayed participation and/or progress in the recommended services." Orphans' Court Opinion, 11/9/21, at 17.

address the circumstances surrounding his abuse of Child and K.B. Several months after beginning services, Father suffered a setback with his mental health. He opted to move across the state from Child, thereby terminating the agency-referred services because he was out of the service area. N.T., 8/31/21, at 88. Father's voluntary relocation to Philadelphia resulted in the termination of his agency-referred services and his visitation with child. In addition to not working on substance abuse and parenting concerns while in Philadelphia, crucially this meant he went without follow-up care after his mental health crisis. Father did not re-enroll in any services until after the termination petition was filed and just weeks before the hearing in a last-ditch effort to save his parental rights. *See id.* at 134; *see also* 23 Pa.C.S.A. § 2511(b) (prohibiting a court from considering post-petition remedial actions in its termination analysis). At the time of the hearing, Father had not seen Child in person for approximately nine months. *Id.* at 68. Further, his remote contact with Child ended due to the terms of Father's bond agreement prohibiting contact with Child.

While Father's testimony conveyed his intent to improve, he failed to demonstrate that he remedied any of the conditions necessary for reunification. *See In re G.M.S.*, 193 A.3d 395, 402-403 (Pa. Super. 2018), *quoting In re Adoption of R.J.S.*, *supra* (determining "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities."). Instead, he explained that he was still

working on his own personal stability in securing a doctor, dentist, car, and house. N.T., 8/31/21, at 135. Most significantly, Father did not display any insight into his abuse of Child, instead testifying, "I feel like I'm a great father." *Id.* at 138. The closest he came to addressing what happened to Child was that he "had [his] lapses" and "[w]e all stumble" and "make mistakes." *Id.* He closed with a request for the court to give him "a chance." *Id.* at 139.

Based upon these facts, we discern no abuse of discretion or error of law in the orphans' court's conclusion that termination was appropriate pursuant to section 2511(a)(8).

We turn now to subsection (b), which requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 628 (citation and quotation marks omitted). Our Supreme Court has made clear that section 2511(b) requires the orphans' court to consider the nature and status of bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-485 (Pa. 1993). It is reasonable to infer that no bond exists when there is no evidence suggesting the existence of one. *See In re K.Z.S.*, 946 A.2d 753, 762–763 (Pa. Super. 2008). To the extent there is a bond, the orphans' court must examine whether termination of parental rights will destroy a "necessary and

beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *In re E.M.*, 620 A.2d at 484-485.

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, 267 A.3d at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an

obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id.*

The orphans' court determined the Agency proved its burden under subsection 2511(b). Orphans' Court Opinion, 11/9/21, at 23. Although the court acknowledged Father's perception that he had a great bond with Child, it credited the professional and uncontradicted testimony of Dr. Menta[11] and the Agency's caseworker, Ms. Weaver, in concluding that termination of Father's parental rights served Child's needs and welfare. *See id.* at 19-23.

The record supports the court's determination. Father testified to his belief that he and Child shared a "[g]reat bond" that was "unbreakable." *Id.* at 129. But, even if true, any existing bond coincided with Child's experiencing physical harm by Father at the very young age of two. After she was removed from Father's care, Child spent 18 months in foster care, where she

_____

[11] Dr. Menta testified as an expert witness regarding parental capacity evaluations and bonding assessments she had performed regarding Mother, Child's foster parents, Aunt, and Father. N.T., 8/31/21, at 11. Father did not attend his appointment and did not attempt to reschedule. *Id.* at 44-45. Dr. Menta's reports, the only exhibits the Agency introduced at the hearing, were not included in the certified record sent to this Court. Although the orphans' court relied upon and cited portions of the evaluations in its findings accompanying the decree, *see* Orphans' Court Opinion, 11/9/2021, at 18-22, their absence does not materially hamper our appellate review. The only evaluations related to termination of Father's parental rights were the ones assessing the relationship between Child and her foster parents, and much of the quoted portions overlap with the testimony provided by Dr. Menta at trial. Moreover, even without the reports, other evidence of record clearly and convincingly demonstrates termination serves Child's needs and welfare, as discussed *infra*.

experienced long stretches of time without contact with Father. Her last in-person contact with Father was approximately nine months prior and her last remote contact with him was four to five months prior to the filing of the petition. She was just over three and one-half years old at the time of the hearing. Based on these circumstances, the court was within its discretion to conclude that severing Child's relationship with Father was necessary and beneficial.

Since her removal, the same foster family has cared for Child and K.B., her half-brother. Ms. Weaver, the Agency's caseworker, believed the consistency Child experienced with her foster family allowed Child and K.B. to "prosper in their growth." N.T., 8/31/21, at 76. Over her time in foster care, Ms. Weaver observed Child become more outgoing, more able to communicate her wants and needs, and "secure enough" to express preferences. *Id.* at 77. She observed positive, consistent, and engaged interactions between Child and her foster parents. *Id.* In Ms. Weaver's view, terminating Father's rights would serve Child's needs and welfare because the current environment in the foster home will enable Child to grow, whereas Father's lack of participation in services negatively affected his ability to provide stability for Child. *Id.*

The observations and opinion of Dr. Menta, who testified as an expert in psychology, were consistent with Ms. Weaver's testimony. Dr. Menta twice evaluated the relationship between Child and her foster parents. She deemed Child to be "tuned in" to her foster parents and observed affection during the

first evaluation. *Id.* at 21. During the second evaluation six months later, Dr. Menta observed that the bond had strengthened between Child and her foster parents, which was a sign of a healthy environment. *Id.* at 22-23. Child, her half-brother, and foster parents were "very relaxed and very comfortable with one another," Child was "very engaged with the foster parents," and "both foster parents were very attentive and tuned in with what the children were doing." *Id.* at 22.

In Dr. Menta's opinion, the benefits of terminating parental rights far outweighed the risks. *Id.* at 30. She acknowledged that because Father failed to attend his scheduled appointment with her, her opinion was limited insomuch as she had not seen Father and Child together. *Id.* at 30, 45-46. Nevertheless, from what she observed of Child with her foster parents, Child appeared to have a primary bond with foster parents, which was an indicator that foster parents were "consistent, positive, [and] very engaged" with Child in a healthy manner. *Id.* at 46.

Given the past abuse experienced by Child, her long duration in foster care at a young age, Father's absence from her life, Child's primary bond and secure relationship with her foster family, and her thriving under their care, the orphans' court did not abuse its discretion in choosing to protect Child's relationship and stability with foster parents over her relationship with Father. *See In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008) ("[W]e agree with the court that the bond between [Child] and [foster parent] is the primary

bond to protect, given [the child's] young age and his very limited contact with [his or her parent]."). The court was within its discretion to ensure Child continued to benefit from stability and safety with her foster family. *Id.*; *see also In re M.M.*, 106 A.3d at 118.

Based upon the foregoing, we agree with counsel that a challenge to the sufficiency of evidence to support the orphans' court's decision to terminate Father's parental rights pursuant to subsections 2511(a) and (b) has no merit.

Finally, considering our duty to ascertain whether there are any arguably meritorious issues counsel missed or misstated, we observe that the orphans' court referenced facts from outside the record within its opinion terminating Father's parental rights. *See Interest of S.S.*, 252 A.3d 681, 688-689 (Pa. Super. 2021) (noting that, while termination and dependency proceedings often occur simultaneously, it is error to rely upon dependency evidence which was not entered as part of the termination proceeding record). Specifically, the orphans' court included a section, entitled "procedural history and facts," which provided a brief overview of the adjudication and permanency review hearings in Child's dependency case and appears to refer to the findings from each dependency hearing. *See* Orphans' Court Opinion, 11/9/21, at 2-4. Because the Agency did not introduce the dependency records into evidence at the termination proceeding, the court erred by relying upon such evidence. *See In re Quick*, 559 A.2d 42, 47 (Pa. Super. 1989)

("the basis for the termination decision … must stand on its own evidence and be established by clear and convincing evidence.").

The orphans' court's reliance on extraneous evidence, while error, does not entitle Father to relief. Such an error is harmless in a termination of parental rights case if "the evidentiary error could not have had **any** impact upon the orphans' court's decision." *In re A.J.R.-H.*, 188 A.3d 1157, 1175 (Pa. 2018) (emphasis added). Upon review of the record, we conclude most of the facts mentioned in the orphans' court's opinion could not have affected the orphans' court's decision to terminate Father's rights. Although the facts lack citations, many are duplicative of testimony at the termination of parental rights hearing. *Compare* Orphans' Court Opinion, 11/9/21, at 2-4 *with* N.T., 8/31/21, at 55, 65-69, 76, 80, 88-90. Of the facts in the opinion that do not appear in the certified record, most are limited to irrelevant details such as dates of permanency review hearings.

Our review reveals only one substantive statement unsupported by the record in the termination matter: that at the time of the first permanency review hearing on September 1, 2020, "Father was struggling with some anger issues, as well as lack of insight regarding the reason for the removal of the children." Orphans' Court Opinion, 11/9/21, at 3. Notwithstanding this single passing reference within the procedural history section of its opinion, the orphans' court clearly relied upon Father's large gap in service participation to support its conclusion that the conditions that led to removal continued to

exist. *See* Orphans' Court Opinion, 11/9/21, at 16-19; *see also In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (explaining that the relevant inquiry of section 2511(a)(8) is "whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing."). Reunification was not imminent; Father and Child had not had any in-person contact for almost a year. Consequently, though the orphans' court erred by *sua sponte* referring to Father's progress as of the first permanency review hearing, we conclude that such error was harmless because it could not have affected the court's termination decision. Accordingly, this issue does not afford Father relief.

Our review of the record reveals no "arguably meritorious issues that counsel, intentionally or not, missed or misstated." *Dempster*, 187 A.3d at 272. Accordingly, we affirm the order terminating Father's parental rights and grant counsel's petition to withdraw.

Order affirmed. Petition to withdraw granted.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/24/2022